1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**

9                   **CENTRAL DISTRICT OF CALIFORNIA**

10

11  SAMANTHA E. ROTHWELL,              )    NO. SACV 11-01046 SS
                                       )
12                 Petitioner,         )
                                       )
13          v.                         )    **MEMORANDUM DECISION AND ORDER**
                                       )
14  LYDIA C. HENSE, Acting Warden,     )
                                       )
15                 Respondent.         )
                                       )
16  _____ )

17

18                            **I.**

19                        **INTRODUCTION**

20

21      On July 13, 2011, Samantha E. Rothwell ("Petitioner"), a California

22  state prisoner proceeding <u>pro se</u>, filed a Petition for Writ of Habeas

23  Corpus by a Person in State Custody (the "Petition") pursuant to 28

24  U.S.C. § 2254.  On August 12, 2011, Respondent[1] filed an Answer to the

25  Petition (the "Answer"), as well as a memorandum of points and

26

27  _____

28      [1]  Lydia C. Hense, Acting Warden for the Central California Women's
    Facility, where Petitioner is currently incarcerated, is substituted as
    the proper Respondent.  <u>See</u> Fed. R. Civ. P. 25(d).

authorities in support of the Answer (the "Answer Memo").  Respondent lodged eight documents from Petitioner's state proceedings, including a two-volume copy of the Clerk's Transcript ("CT"), a one-volume copy of the Clerk's Supplemental Transcript ("CST"), and a seven-volume copy of the Reporter's Transcript ("RT").  The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  For the reasons discussed below, the Petition is DENIED and this action is DISMISSED WITH PREJUDICE.

## II.

### PRIOR PROCEEDINGS

On April 16, 2008, a jury in the Orange County Superior Court convicted Petitioner of second degree murder in violation of California Penal Code ("Penal Code") section 187(a).  (2 CT 282).  The jury also found true the allegation that Petitioner personally used a deadly weapon pursuant to Penal Code section 12022(b)(1).  (2 CT 283).  On June 13, 2008, the trial court sentenced Petitioner to an aggregate indeterminate term of sixteen years to life in state prison.  (2 CT 357).

On April 22, 2010, the California Court of Appeal affirmed the trial court's judgment with a reasoned opinion.  (Lodgment 5, Unpublished Opinion of the California Court of Appeal ("Lodgment 5") at 1, 2, 13).  Petitioner subsequently filed a petition for review in the California Supreme Court, which was denied on June 30, 2010, without comment or citation to authority.  (Lodgment 6, Petition for Review ("Lodgment 6"); Lodgment 7, California Supreme Court Order ("Lodgment

1  7")).  Petitioner did not seek collateral review in the state courts.
2  On July 13, 2011, Petitioner filed the instant Petition.

3

4                                    **III.**

5                            **FACTUAL BACKGROUND**

6

7      The following facts, taken from the California Court of Appeal's
8  unpublished decision, have not been rebutted with clear and convincing
9  evidence and must, therefore, be presumed correct.  28 U.S.C. §
10 2254(e)(1).

11

12         One afternoon, a group of 10 to 15 friends rented a room
13         at the Hotel Huntington Beach to celebrate Nicole Alcala's
14         birthday.  [Petitioner], one of the invitees, and her friend,
15         Kristina Torres, arrived around 8:30 p.m.  Marc Bellatiere
16         and his girlfriend, Jennifer Mulcahy, were at the party when
17         [Petitioner] and Torres arrived.  Mulcahy also invited her
18         brother Ryan Soto.  Eighteen-year-old Walter Rivas was also
19         at the party.

20

21         Sometime in the evening, the group went to the beach to
22         meet with friends.  [Petitioner] chose to stay at the hotel.
23         When the group returned sometime after midnight, Soto
24         recalled that [Petitioner] "didn't seem like herself."  While
25         some people started getting ready for bed, Bellatiere went
26         outside to the fifth floor stairwell landing to smoke a
27         cigarette.  Mulcahy, Torres, [Petitioner], and Rivas joined
28         him.  For the first five to 10 minutes, the mood was fine.

                                       3

However, the atmosphere changed when Rivas began talking about seeing God the last time he was in Huntington Beach. [Petitioner] became upset and ordered Rivas to not "talk about God.  I don't like hearing about that stuff."  Rivas was taken aback by [Petitioner's] response and asked her why. She replied, "It's because I'm the devil," and demanded Rivas "stop talking about it."  Rivas responded, "I'll talk about whatever I want."  [Petitioner] threatened, "If you don't stop talking, shut up, I'll stab you."  No one in the group took [Petitioner's] threat seriously.  Rivas said jokingly, "If you are going to do it, do it," and continued to talk about God.  Rivas was not threatening, did not make any aggressive moves toward [Petitioner], and made no physical contact with her.

[Petitioner] walked to the hotel room and flung the door open.  Mulcahy followed and tried to calm her down.  Rivas stayed on the landing talking with Torres.  When [Petitioner] and Mulcahy entered the hotel room, it was dark and everyone was sleeping.  [Petitioner] went to the side of the bed where her belongings were located and began digging through her purse while saying, "Fuck this guy . . . he can't be talking to me like this."  Mulcahy tried to grab [Petitioner] and calm her down, but [Petitioner] pulled away and left the room.

[Petitioner] returned to the stairwell and headed straight for Rivas.  [Petitioner] swung her closed fist

toward Rivas's neck.   Rivas was substantially taller than [Petitioner] and struggled against her, but she stabbed him in the jugular vein and in the back.   When [Petitioner] took her arm away, Rivas was bleeding profusely and said, "That bitch fucking stabbed me.   That bitch fucking stabbed me." Bellatiere and Torres walked Rivas back to the hotel room where they had him lay on the bathroom floor.

[Petitioner] returned to the room and quickly gathered her things to leave.   Soto asked, "Why did you do it? What happened?" and [Petitioner] responded, "It wasn't a big fucking deal, get over it," or "Get the fuck over it.  Fuck you," and left the room passing a bloody Rivas.   [Petitioner] left bloody fingerprints on the stairwell railing as she left.   Someone called 911.

Bellatiere, Mulcahy, and Soto left the hotel scared and panicked while Alcala and Torres tended to Rivas.   The group drove down the street and parked.   Bellatiere left because he was the only one in the group who was over 21 years old and had brought alcohol for the party, which included underage party guests.   Bellatiere, Mulcahy, and Soto called Mulchay's mother and asked what they should do.   As a result of that conversation, about one hour later, Bellatiere, Mulcahy, and Soto returned to the hotel.   Bellatiere and Mulcahy spoke to police who were at the hotel.

5

Rivas died at the hospital.  An autopsy determined he bled to death as a result of an L-shaped stab wound in the left jugular vein of the neck.  Rivas had a blood alcohol level of .09% before his death.  He would have needed four and one-half to five drinks to reach that level.

Police officers arrested [Petitioner] the next day at her apartment in Valencia.  Officer Michael Reilly executed a search warrant and found her purse and backpack.  In a small pocket of her backpack, he found a folding knife with dried blood on it.  Dried blood was also found on her backpack, tennis shoes, and pants.  Inside [Petitioner's] purse, Reilly found a McDonald's receipt from earlier that morning at 2:39 a.m. for a double cheeseburger and chicken nuggets.

Later that day, officers interviewed [Petitioner] at the Huntington Beach Police Department.  After waiving her Miranda[FN2] rights, [Petitioner] told police she consumed three beers and two or three shots of alcohol and vomited while the others were at the beach.  [Petitioner] explained that while having a cigarette on the fire escape, she had a conversation with Mulcahy about how she used to cut herself, which sparked an argument with Rivas.  She recalled Rivas said he "found God in Huntington Beach," but said it did not make her upset and she was joking when she said the devil visited her.  She explained Rivas had been drinking and yelled at her to stab him.  In response, she walked back to the hotel room and got her knife.  She denied saying she was

going to stab Rivas.  When she went back to the stairwell, [Petitioner] alleged Rivas was taunting her to "stab me like that."  [Petitioner] explained the two were wrestling and she was trying to get away when she swung three times at his stomach and back and inadvertently stabbed him in the neck. [Petitioner] explained Torres was screaming at her to stop, but she was "drunk" and "pissed off" because Rivas had yelled at her and was grabbing her by the arms.  She told police that after she stabbed Rivas, he said, "You got me," and "[She] killed him."  [Petitioner] admitted seeing Rivas laying on the floor bleeding profusely but gathered her belongings and left the hotel room because she was terrified and realized he might die.  [Petitioner] recalled saying, "tell everybody to go to hell" to Mulcahy's friend Marshall who had followed her down the stairs.  [Petitioner] explained that when she left the hotel she drove to McDonald's and purchased a double cheeseburger and chicken nuggets. [Petitioner] explained she then went home and waited for the police to come and arrest her.

[FN2] <u>Miranda v. Arizona</u> (1966) 384 U.S. 436.

During the interview, [Petitioner] at times explained she was really drunk during the incident.  However, she also denied feeling "buzzed," explaining she could "see straight" and was not falling down drunk.  She also admitted she drinks "a little bit" and takes medical marijuana everyday. [Petitioner] said she takes Lexapro for anxiety and

7

depression and that she had taken her medication the night of the incident. [Petitioner] told police she has anger problems and when her father died two years ago it "kinda pushed" her over the edge. She admitted to stabbing a friend Alex Montes in the arm approximately a year and one-half before when they were drunk and playing around. [Petitioner] explained she was not mad at Montes, but he had said "you won't [stab me]," so she did. [Petitioner] agreed there were similarities about the two incidents with Rivas and Montes because each man had dared her to stab him.

[Petitioner] cried while she told police she did not mean to kill Rivas. When she heard about Rivas's death she "felt sick" and felt bad for his family. [Petitioner] did not know what made her do it and admitted she is "not right."

An indictment charged [Petitioner] with murder in violation of Penal Code section 187, subdivision (a).[FN3] The indictment alleged she personally used a knife, a dangerous and deadly weapon, in the commission of the crime, pursuant to section 12022, subdivision (b)(1).

[FN3] All further statutory references are to the Penal Code.

At trial, the prosecutor offered Montes's testimony. Montes testified he was a good friend of [Petitioner], had known her for three years, and would see her everyday.

8

Montes explained a conversation he had with [Petitioner] in which she told him that she did not believe in God because her father told her to say her prayers and when [Petitioner] woke up in the morning, her father was dead.  He testified [Petitioner] would get upset and very emotional if the topic of God was discussed.  He recalled she would say, "Don't ever bring God up in my house again. I don't believe it."  Despite her anger about any discussion of God, he never saw [Petitioner] pick up a weapon or heard her say she would stab someone for talking about God.  Montes recalled a night when he and [Petitioner] were "playing around" and [Petitioner] said, "if you make me mad enough I'll stab you."  Not taking [Petitioner] seriously, Montes explained he said jokingly, "you won't stab me" and stuck his arm out.  In response, she pushed the knife into his arm, drawing blood.  She apologized the next day, and Montes still considers her a close friend.

Mulcahy also testified for the prosecution.  Mulcahy was a friend of [Petitioner] from high school and stayed in touch weekly.  Mulcahy testified [Petitioner] appeared to be fine when she entered the party.  She explained it was the first time Rivas and [Petitioner] had met.  She believed [Petitioner] was not religious but was also not an atheist.  She also knew [Petitioner] carried a knife for protection and could get very angry.  Mulcahy testified everyone drank throughout the night.

9

The prosecutor also offered the testimony of a forensic scientist, Annette McCall. McCall testified blood samples gathered from the scene compared with known samples of Rivas's DNA revealed Rivas could "not be eliminated as a source." She also testified blood samples gathered from [Petitioner's] backpack and knife compared with known samples of Rivas's DNA revealed Rivas could "not be eliminated as a source."

[Petitioner] offered Torres's testimony. Torres explained she and [Petitioner] were best friends. Torres said they "probably smoked marijuana" before going to the hotel and she saw [Petitioner] smoking marijuana throughout the night. Torres described Rivas as always having a smile on his face. According to Torres, Rivas and [Petitioner] were talking about religion on the landing and Rivas said he saw God on the beach. [Petitioner] said, "I'm the devil." Torres explained Rivas was calm and [Petitioner] was yelling and then left briefly. Torres recalled that when [Petitioner] returned, it appeared as though she was dancing with Rivas. She eventually realized it looked confrontational and Rivas was trying to push [Petitioner] away. Torres testified she never saw a knife. She saw the blood pouring from Rivas's neck but did not think he would die. Torres helped Rivas until the paramedics arrived. She remembered Rivas saying, "Tell my mother I love her." She stated [Petitioner] gathered her belongings and left the hotel room. Torres thought she heard [Petitioner] say upon

her departure, "It's no big deal, fucking deal with it." Torres said Rivas had not been confrontational or argumentative with [Petitioner] that night or in the past. However, Torres explained [Petitioner] becomes confrontational whenever the subject of God comes up. Torres also explained that if someone tells [Petitioner] not to do something, she will do it. Furthermore, if someone dares [Petitioner] to do something, she will. Torres testified she witnessed the stabbing of Montes by [Petitioner], which was the result of a dare. Torres also testified "'[Petitioner] goes from zero to maniac . . . if you push her button.'"

Torres admitted lying to the police to protect [Petitioner]. She tried to protect [Petitioner] because she knew what [Petitioner] did was wrong and it was no accident. Torres explained she called Christian Robinson, [Petitioner's] boyfriend, and told him that [Petitioner] had stabbed someone. Two days later, Torres felt she could no longer protect [Petitioner] and typed a statement to police that she both faxed and hand delivered. In the statement, she explained [Petitioner] had stabbed Rivas. She also reported [Petitioner] said to Rivas, "Oh yeah, oh, you don't think I won't. You think I won't."

The trial court instructed the jury on first degree murder and second degree murder—both on the implied malice and no premeditation theories—and involuntary manslaughter. [Petitioner's] counsel requested CALCRIM No. 3426, the

11

voluntary intoxication instruction.  The prosecutor objected based on [Petitioner's] statement she was not buzzed.  The trial court expressed a preference for CALCRIM No. 625, a voluntary intoxication instruction that pertains directly to homicide. Defense counsel requested CALCRIM No. 625 be modified to add malice aforethought, which includes implied malice.  The requested instruction (the Special Instruction) provided: "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation, <u>or acted with malice aforethought</u>. [¶] A person is <u>voluntarily intoxicated</u> if he or she becomes intoxicated by willingly using any intoxicating drug, drink, or other substance knowing that it could produce an intoxicating effect, or willingly assuming the risk of that effect. [¶] You may not consider evidence of voluntary intoxication for any other purpose."  The court declined to instruct the jury with the Special Instruction. Instead, the court instructed the jury with CALCRIM No. 625 without the "or acted with malice aforethought" language.

The jury convicted [Petitioner] of second degree murder and found true the allegations she personally used a deadly or dangerous weapon, a knife.  The trial court sentenced her to prison for a total term of 16 years to life.

(Lodgment 5 at 2-8).

12

# IV.

## PETITIONER'S CLAIM

Petitioner's sole claim for relief is that the trial court erred by "not allow[ing] jury instruction regarding the consideration of voluntary intoxication when determining whether Petitioner had acted with conscious disregard for human life." (Petition at 5).

# V.

## STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which effected amendments to the federal habeas statutes, applies to the instant Petition because Petitioner filed it after AEDPA's effective date of April 24, 1996. Lindh v. Murphy, 521 U.S. 320, 336, 117 S. Ct. 2059, 138 L. Ed. 2d 481 (1997). "By its terms [AEDPA] bars relitigation of any claim 'adjudicated on the merits' in state court, subject only to the exceptions in §§ 2254(d)(1) and (d)(2)." Harrington v. Richter, __ U.S. __, 131 S. Ct. 770, 784, 178 L. Ed. 2d 624 (2011). Pursuant to 28 U.S.C. § 2254(d)(1) and (d)(2), a federal court may only grant habeas relief if the state court adjudication was contrary to or an unreasonable application of clearly established federal law or was based upon an unreasonable determination of the facts.

AEDPA limits the scope of clearly established federal law to the holdings of the United States Supreme Court as of the time of the state court decision under review. Lockyer v. Andrade, 538 U.S. 63, 71, 123

13

1  S. Ct. 1166, 155 L. Ed. 2d 144 (2003).  Circuit precedent is relevant
2  under AEDPA when it illuminates whether a state court unreasonably
3  applied a general legal standard announced by the Supreme Court.  See
4  Crater v. Galaza, 491 F.3d 1119, 1126 n.8 (9th Cir. 2007).

5

6      To the extent that Petitioner's federal habeas claims were not
7  addressed in any reasoned state court decision, however, this Court
8  conducts an independent review of the record.  See Pirtle v. Morgan, 313
9  F.3d 1160, 1167 (9th Cir. 2002).  In such circumstances, "the habeas
10 petitioner's burden still must be met by showing there was no reasonable
11 basis for the state court to deny relief."  Richter, 131 S. Ct. at 784.
12

13     Here, Petitioner raised her claim before the California Court of
14 Appeal on direct review.  (Lodgment 2, Appellant's Opening Brief
15 ("Lodgment 2") at 17-45).  Petitioner invoked the federal nature of her
16 claim by specifically citing the Federal Constitution.  (Id. at 17).
17 The California Court of Appeal denied Petitioner's claim on the merits
18 and expressly addressed her claim under the Federal Constitution.
19 (Lodgment 5 at 8-13).  Petitioner next raised her claim before the
20 California Supreme Court in her petition for review.  (Lodgment 6 at 4-
21 32).  Petitioner again invoked the federal nature of her claim by
22 specifically citing the Federal Constitution.  (Id. at 4).  The
23 California Supreme Court denied review without comment or citation to
24 authority.  (Lodgment 7).

25

26     The Ninth Circuit has held that the California Supreme Court's
27 silent denial of a petition for review satisfies the exhaustion
28 requirement.  See Williams v. Cavazos, 646 F.3d 626, 637 n.5 (9th Cir.

2011).  However, the Ninth Circuit explained that the silent denial of a petition for review is "not a decision on the merits" and that federal habeas courts must "look through" the silent denial to the last reasoned state court decision.  <u>Id.</u> at 636.  The last reasoned state court decision here is the opinion of the California Court of Appeal.  Because the California Court of Appeal expressly addressed Petitioner's claim under the Federal Constitution, (Lodgment 5 at 8-13), the claim has been "adjudicated on the merits" within the meaning of 28 U.S.C. section 2254(d).[2]  The deferential standard of review contained in sections 2254(d)(1) and (d)(2) therefore applies to Petitioner's claim.  <u>Richter</u>, 131 S. Ct. at 784-85.

**VI.**

**DISCUSSION**

**A.**    <u>**Petitioner Is Not Entitled To Habeas Relief On Her Instructional**</u>
       <u>**Error Claim**</u>

     Petitioner contends the trial court violated her constitutional rights by failing to instruct the jury "regarding the consideration of voluntary intoxication when determining whether Petitioner had acted with conscious disregard for human life."  (Petition at 5).  Specifically, Petitioner argues that the trial court should have

---

[2] Because the court of appeal "adjudicated on the merits" Petitioner's claim, this Court must decide Petitioner's claim based upon the state court evidence.  Cullen v. Pinholster, ___ U.S. ___, 131 S. Ct. 1388, 1400, 179 L. Ed. 2d 557 (2011) ("[E]vidence introduced in federal court has no bearing on § 2254(d)(1) review.").  Petitioner has not demonstrated that she is entitled to an evidentiary hearing.

15

1   instructed the jury with a modified version of CALCRIM No. 625, which
2   would have allowed the jury to consider her voluntary intoxication in
3   order to negate the formation of malice aforethought necessary for
4   implied malice murder. (Lodgment 6 at 7-8).[3] Petitioner further argues
5   that Penal Code section 22(b), which prohibits evidence of voluntary
6   intoxication to negate implied malice murder, is unconstitutional. (Id.
7   at 9-32). There is no merit to this claim.

8

9        Jury instructions are generally matters of state law for which
10  federal habeas relief is not available, except insofar as an
11  instructional error implicates the fundamental fairness of a trial in
12  violation of due process or infringes upon an enumerated federal
13  constitutional right. See Waddington v. Sarausad, 555 U.S. 179, 190-91,
14  129 S. Ct. 823, 172 L. Ed. 2d 532 (2009); Estelle v. McGuire, 502 U.S.
15  62, 71-72, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) ("[T]he fact that
16  the instruction was allegedly incorrect under state law is not a basis
17  for habeas relief."). Where the alleged error is the failure to give
18  an instruction, the burden on the petitioner is "especially heavy."
19  Henderson v. Kibbe, 431 U.S. 145, 155, 97 S. Ct. 1730, 52 L. Ed. 2d 203
20  (1977) ("An omission, or an incomplete instruction, is less likely to
21  be prejudicial than a misstatement of the law."). "The significance of
22  the omission of such an instruction may be evaluated by comparison with
23  the instructions that were given." Id. at 156. Even if an error
24  occurred in instructing the jury, habeas relief will be granted only if

25

26        [3]  The Petition contains only two sentences of explanation in
    support of Ground One. (Petition at 5). However, Petitioner attached
27  to the Petition a copy of his petition for review before the California
    Supreme Court. Thus, the Court refers to the petition for review for
28  further guidance on Petitioner's claim.

the petitioner can establish that the error had a substantial and injurious effect or influence in determining the jury's verdict. Hedgpeth v. Pulido, 555 U.S. 57, 61-62, 129 S. Ct. 530, 172 L. Ed. 2d 388 (2008) (per curiam) (citing Brecht v. Abrahamson, 507 U.S. 619, 623, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)).

On direct review, the California Court of Appeal rejected Petitioner's instructional error as follows:

Due Process and Fair Trial

[Petitioner] contends her federal constitutional rights to due process and a fair trial were violated when the trial court, relying on section 22, refused to instruct the jury it may consider her voluntary intoxication to negate implied malice. Specifically, she argues section 22, subdivision (b), is unconstitutional because it was designed to keep out relevant, exculpatory evidence and is not a redefinition of the mental state element of the offense. We disagree.

Section 22, most recently amended in 1995, provides: "(a) No act committed by a person while in a state of voluntary intoxication is less criminal by reason of his or her having been in that condition. Evidence of voluntary intoxication shall not be admitted to negate the capacity to form any mental states for the crimes charged, including, but not limited to, purpose, intent, knowledge, premeditation, deliberation, or malice aforethought, with which the accused

17

committed the act. [¶] (b) Evidence of voluntary intoxication is admissible solely on the issue of whether or not the defendant actually formed a required specific intent, or, when charged with murder, whether the defendant premeditated, deliberated, or harbored <u>express</u> malice aforethought. [¶] (c) Voluntary intoxication includes the voluntary ingestion, injection, or taking by any other means of any intoxicating liquor, drug, or other substance."

The Legislature's 1995 amendment to section 22 inserted the word "express" before the word "malice" in subdivision (b). The 1995 amendment was in direct response to <u>People v. Whitfield</u> (1994) 7 Cal.4th 437 (<u>Whitfield</u>). In <u>Whitfield</u>, the California Supreme Court held evidence of a defendant's voluntary intoxication was admissible to negate implied as well as express malice. (<u>Id.</u> at 451.)

The history of the 1995 amendment to section 22 was most recently addressed in <u>People v. Turk</u> (2008) 164 Cal.App.4th 1361 (<u>Turk</u>). In <u>Turk</u>, the court concluded, "The legislative history of the amendment unequivocally indicates that the Legislature intended to legislatively supersede <u>Whitfield</u>, and make voluntary intoxication inadmissible to negate implied malice in cases in which a defendant is charged with murder." (<u>Turk</u>, <u>supra</u>, 164 Cal.App.4th at pp. 1374-1375.)

[Petitioner] argues section 22 is unconstitutional after the 1995 amendment because "it created a rule that keeps out

18

relevant exculpatory evidence by in effect precluding the jury from considering evidence that could disprove the 'conscious disregard for human life' element of implied malice second degree murder." [Petitioner] relies on <u>Montana v. Egelhoff</u> (1996) 518 U.S. 37 (<u>Egelhoff</u>), and Justice Ginsburg's concurring opinion, to support her contention.

In <u>Egelhoff</u>, a plurality of the court upheld the constitutionality of a Montana statute providing voluntary intoxication "'may not be taken into consideration in determining the existence of a mental state which is an element of [the] offense.'" (<u>Egelhoff</u>, <u>supra</u>, 518 U.S. at p. 57.)  The plurality found no due process violation because the right to have a jury consider intoxication evidence was not a "fundamental principle of justice."  In concurrence, Justice Ginsberg drew a distinction between rules designed to keep out relevant, exculpatory evidence that might negate an essential element of a crime and violate due process, and rules that redefine the mental state element of the offense. (<u>Ibid.</u>)  Justice Ginsburg viewed the Montana statute as a redefinition of the offense's required mental state and therefore excluding evidence of voluntary intoxication was constitutional. (<u>Id.</u> at pp. 57-59.)

"When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the

19

judgments on the narrowest grounds. . . .'" (<u>Marks v. United States</u> (1977) 430 U.S. 188, 193.)   Assuming Justice Ginsburg's concurrence controls, as [Petitioner] urges this court to do, we nonetheless conclude section 22 does not violate due process.

In <u>People v. Timms</u> (2007) 151 Cal.App.4th 1292, 1300-1301 (<u>Timms</u>), the court addressed the identical issue we have here.   The court explained section 22 did not violate a defendant's due process rights because section 22, subdivision (b), did not belong to the "prohibited category of evidentiary rules designed to exclude relevant exculpatory evidence." (<u>Timms</u>, <u>supra</u>, 151 Cal.App.4th at p. 1300.)   The court reasoned, "The absence of implied malice from the exceptions listed in subdivision (b) is itself a policy statement that murder under an implied malice theory comes within the general rule of subdivision (a) such that voluntary intoxication can serve no defensive purpose.   In other words, section 22, subdivision (b)[,] is not 'merely an evidentiary prescription'; rather, it 'embodies a legislative judgment regarding the circumstances under which individuals may be held criminally responsible for their actions.' [Citation.] In short, voluntary intoxication is irrelevant to proof of the mental state of implied malice or conscious disregard. Therefore, it does not lessen the prosecution's burden of proof or prevent a defendant from presenting all relevant defensive evidence." (<u>Id.</u> at pp. 1300-1301)

20

The <u>Timms</u> court found illuminating the fact section 22 does not appear in the Evidence Code, it appears in the Penal Code.  (<u>Timms</u>, <u>supra</u>, 151 Cal.App.4th at p. 1300.) Additionally, the court acknowledged the California Supreme Court's holding in <u>People v. Atkins</u> (2001) 25 Cal.4th 76, which rejected a due process challenge to section 22 in the context of the general intent crime of arson. (<u>Timms</u>, <u>supra</u>, 151 Cal.App.4th at p. 1300.)

With respect to Justice Ginsburg's concurrence, the court stated that assuming the concurrence controls, "Justice Ginsberg also stated: 'Defining *mens rea* to eliminate the exculpatory value of voluntary intoxication does not offend a "fundamental principle of justice," given the lengthy common-law tradition, and the adherence of a significant minority of the States to that position today. [Citations.]' [Citation.] Under this rational, the 1995 amendment permissibly could preclude consideration of voluntary intoxication to negate implied malice and the notion of conscious disregard. Like the Montana statute, the California Legislature could also exclude evidence of voluntary intoxication in determination of the requisite mental state." (<u>Timms</u>, <u>supra</u>, 151 Cal.App.4th p. 1300.)  Therefore, the court concluded section 22 did not infringe [Petitioner's] constitutional rights.

[Petitioner] also argues the trial court's application of section 22 violated her constitutional right to due process and a fair trial because, "[t]he level of a defendant's intoxication is undeniably relevant evidence on the issue of whether he or she consciously disregarded a risk to human life."   We find People v. Martin (2000) 78 Cal.App.4th 1107 (Martin), instructive.

In Martin, supra, 78 Cal.App.4th at page 1113, the court rejected this constitutional challenge to section 22.   The court explained, "Section 22 states the basic principle of law recognized in California that a criminal act is not rendered less criminal because it is committed by a person in a state of voluntary intoxication."   The court stated section 22 "is closely analogous to [the Legislature's] abrogation of the defense of diminished capacity . . . . The 1995 amendment to section 22 results from a legislative determination that, for reasons of public policy, evidence of voluntary intoxication to negate culpability shall be strictly limited. We find nothing in the enactment that deprives a defendant of the ability to present a defense or relieves the People of their burden to prove every element of the crime charged beyond a reasonable doubt."   (Martin, supra, 78 Cal.App.4th at p. 1117.)

We find the courts' reasoning in Timms, supra, 151 Cal.App.4th 1292, and Martin, supra, 78 Cal.App.4th 1107,

22

1     persuasive.   Thus, we conclude the trial court's refusal to

2     instruct the jury with [Petitioner's] Special Instruction did

3     not violate her constitutional rights.   The trial court

4     properly instructed the jury with CALCRIM No. 625.

5

6  (Lodgment 5 at 8-12).

7

8     Here, Petitioner cannot meet her "especially heavy" burden of

9  proving that the trial court's failure to instruct the jury with her

10  modified version of CALCRIM No. 625 so infected the entire trial with

11  unfairness that it violated due process.   <u>Henderson</u>, 431 U.S. at 155.

12  As an initial matter, Petitioner's requested instruction was barred by

13  Penal Code section 22(b) and therefore could not have been given.   Penal

14  Code section 22(b) states that "[e]vidence of voluntary intoxication is

15  admissible solely on the issue of whether or not the defendant actually

16  formed a required specific intent, or, when charged with murder, whether

17  the defendant premeditated, deliberated, or harbored <u>express</u> malice

18  aforethought."   Penal Code § 22(b) (emphasis added).   Petitioner's

19  requested modified version of CALCRIM No. 625 would have violated Penal

20  Code section 22(b) by allowing the jury to consider Petitioner's

21  voluntary intoxication in order to negate the formation of malice

22  aforethought necessary for implied malice murder. (7 RT 715-16).   Thus,

23  the trial court properly declined to give Petitioner's requested

24  instruction.

25

26     Moreover, Petitioner cannot show that the trial court's refusal to

27  give her requested instruction violated due process because the

28  instructions that were given accurately reflected California law, which

1   is similar to other laws upheld by the United States Supreme Court.  <u>See</u>

2   <u>Henderson</u>, 431 U.S. at 156 ("The significance of the omission of such

3   an instruction may be evaluated by comparison with the instructions that

4   were given."); <u>see also</u> <u>Montana v. Egelhoff</u>, 518 U.S. 37, 51-56, 116 S.

5   Ct. 2013, 135 L. Ed. 2d 361 (1996) (plurality) (upholding Montana law

6   that prohibited the introduction of voluntary intoxication evidence to

7   negate the existence of a mental state).   Indeed, the trial court

8   instructed the jury pursuant to CALCRIM No. 625 as follows:

10       You may consider evidence, if any, of the defendant's

11       voluntary intoxication only in a limited way.   You may

12       consider that evidence only in deciding whether the defendant

13       acted with an intent to kill, or the defendant acted with

14       deliberation and premeditation.

16       A person is <u>voluntarily intoxicated</u> if he or she becomes

17       intoxicated by willingly using any intoxicating drug, drink,

18       or other substance knowing that it could produce an

19       intoxicating effect, or willingly assuming the risk of that

20       effect.

22       You may not consider evidence of voluntary intoxication

23       for any other purpose.

25   (1 CT 273; 7 RT 767-68).   This instruction accurately reflected

26   California law because it permitted the jury to consider evidence of

27   Petitioner's voluntary intoxication for the limited purpose of deciding

28   whether Petitioner acted with <u>express</u> malice.  <u>See</u> Penal Code § 22(b).

1    Petitioner essentially concedes that the trial court's instructions
2 were proper under California law and therefore argues that Penal Code
3 section 22(b) is unconstitutional.  (Lodgment 6 at 8) ("[Petitioner's
4 requested] instruction could not be given here because under subdivision
5 (b) of Penal Code section 22 evidence of voluntary intoxication is not
6 admissible to negate implied malice murder.").  Specifically, Petitioner
7 argues that "Penal Code section 22 is unconstitutional because it denies
8 a defendant due process, the right to present a defense and a jury
9 trial, and thus, the absence of instruction that the jury could consider
10 intoxication in determining [Petitioner's] mental state for second
11 degree murder violated [her] Sixth and Fourteenth Amendment rights."
12 (Id.).

14    In Egelhoff, four justices of the Supreme Court upheld the
15 constitutionality of a Montana law that prohibited the introduction of
16 voluntary intoxication evidence to negate the existence of a mental
17 state.  Egelhoff, 518 U.S. at 51-56.  The plurality explained that the
18 Montana statute did not violate the Due Process Clause because it did
19 not lower the burden of proof, but instead simply "made it easier for
20 the State to meet the requirement of proving mens rea beyond a
21 reasonable doubt" by "excluding a significant line of evidence that
22 might refute mens rea."  Id. at 55.  The plurality further explained
23 that nothing "in the Due Process Clause bars States from making changes
24 in their criminal law that have the effect of making it easier for the
25 prosecution to obtain convictions."  Id.

27    Justice Ginsburg concurred in the judgment of the plurality because
28 she agreed that the Montana law did not lower the burden of proof, but

25

instead redefined the substantive element of the offense under state law. See Egelhoff, 518 U.S. at 58 (Ginsburg, J., concurring) ("Comprehended as a measure redefining mens rea, [the Montana law] encounters no constitutional shoal. States enjoy wide latitude in defining the elements of criminal offenses . . . ."). In support of her conclusion, Justice Ginsburg noted that the law "d[id] not appear in the portion of Montana's Code containing evidentiary rules (Title 26), the expected placement of a provision regulating solely the admissibility of evidence at trial[,]" and instead appeared in the portion containing criminal offenses. Id. at 57. Justice Ginsburg further noted that "state courts have upheld statutes similar to [the Montana law], not simply as evidentiary rules, but as legislative redefinitions of the mental-state element." Id. at 59.

Petitioner relies on Justice Ginsburg's concurrence to argue that Penal Code section 22(b) violates the Due Process Clause by lowering the burden of proof. (Lodgment 6 at 12-27). Specifically, Petitioner contends that Penal Code section 22(b) "is not a redefinition of the mental state element of the offense[,]" but is "instead, simply a rule designed to keep out relevant, exculpatory evidence." (Id. at 12) (internal quotation marks omitted). Contrary to Petitioner's argument, however, the Court concludes that Penal Code section 22(b) is analogous to the Montana law approved of by Justice Ginsburg and the plurality in Egelhoff. As an initial matter, Penal Code section 22(b) appears in the portion of California's code containing criminal offenses and not in the portion containing evidentiary rules, which suggests that the statute is more likely a substantive redefinition of the offense under state law rather than merely an evidentiary rule. Egelhoff, 518 U.S. at 57

26

(Ginsburg, J., concurring) (relying on the location of the Montana statute in the portion of the code containing criminal offenses).

Moreover, several California courts have upheld Penal Code section 22(b) as a legislative redefinition of the mental-state element. Egelhoff, 518 U.S. at 59 (Ginsburg, J., concurring) (relying on state-court rulings interpreting similar laws as substantive redefinitions of the mental-state element). First, the California Court of Appeal in People v. Timms, 151 Cal. App. 4th 1292, 60 Cal. Rptr. 3d 677 (2007), held that Penal Code section 22(b) redefined the substantive mental-state element and therefore was constitutional under Justice Ginsburg's concurrence. Id. at 1300. Second, the California Court of Appeal in People v. Martin, 78 Cal. App. 4th 1107, 93 Cal. Rptr. 2d 433 (2000), similarly held that Penal Code section 22(b) redefined the substantive mental-state element and therefore was constitutional under the Egelhoff plurality. Id. at 1117. Finally, in People v. Atkins, 25 Cal. 4th 76, 104 Cal. Rptr. 2d 738 (2001), the California Supreme Court held that Penal Code section 22(b) does not violate due process under the Egelhoff plurality. Id. at 93. Thus, the Court concludes that Penal Code section 22(b) is a legislative redefinition of the mental-state element and therefore does not violate the Due Process Clause under either the Egelhoff plurality or Justice Ginsburg's concurrence. See United States v. Sayetsitty, 107 F.3d 1405, 1413 (9th Cir. 1997) ("We recognize that [the defendant] has no Due Process right to a defense of voluntary intoxication if the legislature chooses to exclude it. See Montana v. Egelhoff, 135 L. Ed. 2d 361, 116 S. Ct. 2013 (1996).").

1    Finally, even if the trial court's refusal to give Petitioner's
2  requested instruction violated due process, Petitioner is not entitled
3  to habeas relief because the error did not have a substantial and
4  injurious effect or influence in determining the jury's verdict.[4]
5  Hedgpeth, 555 U.S. at 61-62.  Indeed, even if the jury was allowed to
6  consider Petitioner's voluntary intoxication, it is unlikely such
7  consideration would have resulted in a different verdict.

8

9    There was ample evidence in the record of voluntary intoxication,
10  as described above by the court of appeal.  See supra Part III.
11  However, despite this evidence of voluntary intoxication, Petitioner's
12  description of the murder to police provided compelling evidence that
13  she formed the intent to kill the victim.  As an initial matter,
14  Petitioner admitted that she stabbed the victim in the neck with her
15  pocketknife.  (2 CT 367-68).  Petitioner explained that the victim began
16  speaking to her about God, which did not upset her and instead caused
17  her to start laughing.  (2 CT 405).  Petitioner was "messing around"
18  with the victim and responded that the devil had "[v]isited [her]."  (2
19  CT 406).  Petitioner stated that eventually the victim began yelling at
20  her, which upset her, and she started yelling back.  (2 CT 406-07).
21  Petitioner "told 'em, 'You need to go to hell[,]'" and then went to her

22

23    [4]  In Hedgpeth, the Supreme Court explained that "while there are
24  some errors to which harmless-error analysis does not apply, they are
   the exception and not the rule."  Hedgpeth, 555 U.S. at 61 (internal
25  quotation marks and brackets omitted).  The Court stated that "harmless-
   error analysis applies to instructional errors so long as the error at
26  issue does not categorically vitiate all the jury's findings."  Id.
   (internal quotation marks and brackets omitted).  Specifically, the
27  Court held that harmless-error analysis applies to an error "arising in
   the context of multiple theories of guilt" and to an "omission or
28  misstatement of an element of the offense."  Id.

room to get her pocketknife. (2 CT 407). When Petitioner returned with her pocketknife, she "was just swinging, [and] tried to hit him in the arm." (2 CT 408). Petitioner stated that she "swung at his stomach at first" for a total of "[l]ike three" swings. (Id.). As Petitioner swung her pocketknife, the victim "was yelling at [her] and taunting and provoking" her. (2 CT 409). The victim said, "Are you gonna stab me? Are you gonna stab me?" (Id.).

While Petitioner was swinging her pocketknife at the victim, her friend Kristina Torres ("Torres") yelled at Petitioner "telling [her] to stop." (2 CT 409) ("She was just screaming at me, telling me to stop."). When asked by the police why she did not listen to Torres and stop, Petitioner responded, "I don't know. 'Cause he was grabbing me and I was mad." (2 CT 410). The police then asked if Petitioner thought she had "anger issues," to which Petitioner responded, "I guess so." (Id.). Petitioner further responded, "I'm pretty violent." (Id.). Petitioner then explained that after she had fatally stabbed the victim, she picked up her things, told everyone to "go to hell," and "walked out the door." (2 CT 411). As Petitioner drove away from the hotel, she did not drive away at a high rate of speed and stopped at McDonald's on her way home. (2 CT 397-98).

As set forth above, Petitioner's own statements to police provided compelling evidence that her voluntary intoxication did not negate the formation of her intent to kill the victim. Petitioner explained that after the victim upset her by yelling, she went to her room for the purpose of getting her pocketknife. (2 CT 406-07). When Petitioner returned with her pocketknife, the victim taunted and provoked her by

1  saying, "Are you gonna stab me? Are you gonna stab me?"  (2 CT 409).
2  Petitioner swung at the victim with her pocketknife for a total of
3  "[l]ike three" swings.  (2 CT 408).  Petitioner did not listen to her
4  friend yelling at her to stop because she "was mad."  (2 CT 410).
5  Petitioner admitted to having "anger issues" and described herself as
6  "pretty violent." (2 CT 410).  Indeed, Petitioner's friend, Alex Montes
7  ("Montes"), testified that Petitioner stabbed him with a knife in 2005
8  after he taunted her saying, "You won't stab me."  (4 RT 402).  Montes
9  further testified that Petitioner did not believe in God and would get
10 upset anytime he brought up the subject.  (4 RT 418).  Finally, Torres
11 testified that Petitioner "goes from zero to maniac right now if you
12 push her button," (5 RT 536), and explained that Petitioner will do
13 anything "if someone dares her to" or "tell[s] her not to do something."
14 (5 RT 533).  Thus, the Court concludes that it is unlikely the jury
15 would have reached a different verdict even if they had been allowed to
16 consider evidence of Petitioner's voluntary intoxication.

17

18     In sum, Petitioner's instructional error claim fails because Penal
19 Code section 22(b) barred Petitioner's requested instruction and Penal
20 Code section 22(b) does not violate the Due Process Clause.  The Court
21 concludes that Penal Code section 22(b) passes constitutional muster
22 under the Egelhoff plurality and Justice Ginsburg's concurrence.
23 Furthermore, even if the trial court's refusal to give Petitioner's
24 requested instruction violated due process, any error was harmless under
25 Hedgpeth and Brecht.  Thus, the Court concludes that the state courts'
26 denial of this claim was not contrary to nor did it involve an
27 unreasonable application of clearly established federal law as
28 determined by the United States Supreme Court, nor was it an

unreasonable determination of the facts.   See 28 U.S.C. § 2254(d).
Accordingly, Petitioner is not entitled to habeas relief.

## VII.

### CONCLUSION

IT IS ORDERED that: (1) the Petition is DENIED; and (2) Judgment
shall be entered dismissing this action with prejudice.

DATED: November 3, 2011

_____
/S/
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE